WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Anthony Sharif Gay,                           )    No. CV 12-0544-TUC-CRP
                                              )
                    Petitioner,               )    **ORDER**
                                              )
vs.                                           )
                                              )
Charles L. Ryan, Director; et al,             )
                                              )
                    Respondents.              )
                                              )
                                              )
                                              )
_____ )

        Petitioner, proceeding pro se, has filed an Amended Petition Under 28 U.S.C. § 2254 For A Writ of Habeas Corpus By A Person In State Custody (Non-Death Penalty). (Doc. 5, Am. Pet.). Respondents have filed an Answer and Petitioner has filed a Reply. (Doc. 12, Answer; Doc. 15, Reply). Pursuant to the Court's Order (Doc. 19, Aug. 11, 2015 Order), Respondents have filed a Supplemental Memorandum (Doc. 24). Petitioner has not filed a Supplemental Response, although permitted to do so. (*See* Doc. 28). This case is before the Court based on the parties' consent to Magistrate Judge jurisdiction. (Doc. 16). After considering the briefing, exhibits and relevant law, the Court has determined that the amended habeas petition should be denied and dismissed with prejudice.

1  **I.     FACTUAL AND PROCEDURAL HISTORY**

2          On April 30, 2004,  a jury returned its verdict finding Petitioner guilty of first degree

3  murder and first degree burglary based on a theory of felony murder with burglary as the

4  predicate crime.  (Ex. A,  *State v. Gay*, 2 CA-CR 2010-0355-(PR) Mar. 3, 2011 Mem.

5  Decision  at ¶ 2; Ex. G, *State v. Gay*, Case No. CR20011542, Sept. 30, 2009 Order at 1; Ex.

6  AAA at Ex. 1 Jury Verdict).[1]  The charges stemmed from the stabbing death of the female

7  victim at her Tucson apartment on or about April 9-10, 2001.  (Ex. G at 1-2).  The trial court

8  sentenced Petitioner to natural life in prison on the murder conviction and to a 10.5 year

9  presumptive concurrent term on the burglary conviction.  (Ex. A at ¶ 2).

10         The Arizona Court of Appeals affirmed Petitioner's conviction and sentence on direct

11 appeal.  *See State v. Gay*, 214 Ariz. 214, 150 P.3d 787 (Ariz. App. 2007).  On January 8,

12 2008, the Arizona Supreme Court denied Petitioner's petition for review.  (Ex. D, Jan. 8,

13 2009 Min. Letter Denying Review).

14         On February 28, 2008, Petitioner filed a Notice of Post-Conviction relief ("PCR

15 Notice").  (Ex. E, PCR Notice).  On January 2, 2009, Petitioner, represented by counsel, filed

16 a Petition for Post-Conviction Relief ("PCR Petition").  (Ex. F, PCR Pet.).  On September

17 30, 2009, the state trial court denied the PCR Petition following an evidentiary hearing.  (Ex.

18 G, Sept. 30, 2009 Order; Ex. H, Apr. 5, 2010 Order; Ex. Q, Feb. 1, 2010 Evidentiary Hr'g

19 Tr ).  Petitioner, represented by counsel, petitioned for review in the Arizona Court of

20 Appeals.  (Ex. I, Pet. for Review). The State Court of Appeals granted review but denied

21 relief.  (Ex.A, Mem. Decision).  On August 8, 2011, the Arizona Supreme Court denied

22 Petitioner's petition for review.  (Ex. J, Aug. 8, 2011 Min. Letter Denying Review).

23

24  _____

25         [1] Relevant portions of the state court record are attached to: Respondents' Answer as
   Exhibits A through Q  (Docs. 12-14), Respondents' Notice of filing additional portions of
26 the state court record as Exhibits R through YY (Doc. 23); and Respondents' Supplemental
   Memorandum as Exhibits ZZ through CCC (Doc. 24).  Unless otherwise noted, the Court
27 cites to the state court record by exhibit number without the corresponding docket number.

28

1

2

3

4

Petitioner placed his federal habeas petition in the prison mailing system on July 17, 2012. (Doc. 1, Pet. at 11). Respondents do not contest the timeliness of Petitioner's habeas petition. Petitioner subsequently amended his federal habeas petition (Doc. 5, Am. Pet.), which is at issue here.

5

6

## II.    PETITIONER'S GROUNDS ASSERTED IN HIS AMENDED § 2254 HABEAS PETITION

7

8

Petitioner asserts the following grounds in his amended habeas petition:

Ground One:  The prosecution impermissibly struck two Black jurors on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986) (Am. Pet. at 6);

9

10

11

12

Ground Two:  Defense counsel provided ineffective assistance at trial in failing to investigate blood pattern evidence that allegedly showed that Petitioner did not come into contact with the victim until after she died (*Id*. at 7);

13

14

Ground Three: Defense counsel provided ineffective assistance at trial in failing to investigate and uncover exculpatory evidence that showed that someone else (Maksim Popenko) committed the murder (*Id*. at 8);

15

16

17

Ground Four: Defense counsel provided ineffective assistance at trial in failing to effectively cross-examine hostile witness Maksim Popenko (*Id*. at 9);

18

19

Ground Five:  The evidence was insufficient to convict Petitioner of the crimes of first degree burglary based on theft and felony murder based on burglary and theft (*Id*. at 12);

20

21

22

Ground Six: The trial court violated Petitioner's due process rights under *Beck v. Alabama*, 447 U.S. 625 (1980), when it failed to instruct the jury on the lesser included offense of theft (*Id*. at 13);

23

24

25

Ground Seven: The trial court violated Petitioner's due process rights when it improperly excluded expert testimony on the effects of crack cocaine and withdrawal from crack cocaine (*Id*. at 14);

26

27

Ground Eight: Petitioner's waiver of rights was not knowing, intelligent, or voluntary in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Doody v. Ryan*, 649 F.3d 986,

28

1    1003-007 (9th Cir. 2011)(en banc), because the detective's explanation was unclear,

2    confusing and misleading (*Id*. at 15) ;

3         Ground Nine: The trial court violated Petitioner's due process rights when it precluded

4    evidence of third-party culpability (*Id*. at 16);

5         Ground Ten: Defense counsel provided ineffective assistance at trial by failing to have

6    DNA testing performed on key evidence (the victim's fingernail scrapings and nightgown)

7    (*Id*. at 17); and

8         Ground Eleven: Defense counsel provided ineffective assistance at trial by failing to

9    object to the prosecutor's alleged reference to Petitioner's invocation of his right to counsel

10   (*Id*. at 18).

11        Respondents argue in their Answer that Petitioner did not assert Grounds Six and Ten

12   in the state court proceedings and, therefore, these grounds are procedurally defaulted and

13   not subject to federal habeas review.  (Answer at 4-6)  Respondents contend that Petitioner's

14   remaining Grounds One through Five, Seven through Nine, and Eleven should be denied on

15   the merits.  (*Id*. at 6-13).

16   **III.    ANALYSIS**

17        **A.            The Trial Evidence.**

18        The trial evidence showed that on or about April 9, 2001, Petitioner's live-in

19   girlfriend, Veronica Fresby, observed Petitioner smoking "crack" around 11:30 p.m. at their

20   apartment. (Ex. M at 96-97, 101).  They argued and Ms. Fresby asked Petitioner to leave.

21   (*Id*. at 100).  Petitioner left the apartment shortly after 12:00 a.m., taking what was left of a

22   12-pack of Natural Light beer, and he did not return until approximately 1:00 a.m. (*Id*. at 97-

23   101).   When Petitioner returned, Ms. Fresby observed that Petitioner appeared visibly

24   intoxicated and was wearing a different shirt from when he had left, that is, he returned

25   wearing a blue t-shirt that Ms. Fresby noticed was "really small" and did not look like a

26   "man's shirt."  (*Id*. 102-05, 111).  Petitioner told Ms. Fresby  that he had obtained the shirt

27   "from the house he had broken into." (*Id*. at 104-05).  The next morning, Ms. Fresby noticed

28

that Petitioner had cut his right index finger. (*Id*. at 105-06, 109). Petitioner first told her that he had cut his finger while performing his landscaping job, but later told her he had cut his finger while breaking a window to get into the house. (*Id*. at 107-09).

On the morning of April 10, 2001, the police found the victim's body, lying on the floor in a "pool of blood," in the bedroom of her apartment. The victim had sustained 23 stab wounds, one of which severed her jugular. (Ex. K at 41-49; Ex. P at 80-96). The victim had been stabbed in the neck and breast area. (Ex. P at 80-96). She was wearing only a white nightgown which was pulled up exposing one of her breasts and leaving her naked from the waist down. (Ex. K at 48-49). Petitioner's fingerprints were found on the victim's bedroom telephone. (Ex. L at 59-62). Petitioner's blood was found throughout the victim's apartment, including on the window sill, window blinds, the front door, along the outside railings and on a chair. (Ex. C at ¶ 7; Ex. L at 40-45; Ex. N at 10-21, 52-53; Ex. P at 175-76, 194). Petitioner's semen was found on the victim's vagina, and his semen and blood were found on the nightgown she was wearing. (Ex. C at ¶ 7; Ex. N at 44-52; Ex. O at 23-39). The shirt Petitioner was seen wearing the night he left his apartment was found underneath the victim and a pair of black jeans found in Petitioner's apartment were stained with his and the victim's blood. (Ex. C at ¶ 7; Ex. L at 36; Ex. M at 214-16; Ex. N at 23-26; Ex. O at 172-75). The blue t-shirt Petitioner was wearing when he returned to his apartment was identified as belonging to the victim. (Ex. JJ at 77-81, 117; Ex. M at 214-16). Petitioner's fingerprints were found on a "Natural Light" beer can in the victim's kitchen. (Ex. L at 41, 168-69).

The day after the murder, Petitioner pawned videotapes and CDs that had belonged to the victim and tried to give his girlfriend a ring that belonged to the victim. (Ex. C at ¶ 7; Ex. L at 119-25, 170-74, 204-08; Ex. P at 32). There was evidence that Petitioner had a deep cut on his finger. (Ex. C at ¶ 6; Ex. M at 106-09). Detectives learned that Petitioner had lived next door to the victim at the same apartment complex for four months and had moved out of that apartment only two weeks before the murder. (Ex. K at 94, 99; Ex. M at 84-86). Ms. Fresby testified that she and Petitioner had "financial difficulties," that for a

1   period she had been the only source of income, and that Petitioner was spending money on

2   crack cocaine which he used daily.  (Ex. M at 87-88).

3        Petitioner was arrested at his apartment on April 17, 2001.  (Ex. M at 124-28).  After

4   he was arrested and during a telephone call, Ms. Fresby asked Petitioner why he did not tell

5   her he had "killed that girl," and Petitioner answered that he "was strung out on crack and

6   was really crazy and wanted more."  (*Id*. at 189, 197).  In another conversation, Petitioner

7   told Ms. Fresby that he did not kill the victim, but had gone into her apartment, found her

8   dead, and cradled her bloody body in his arms.  (*Id*. at 131).  Petitioner told Ms. Fresby that

9   his shirt was bloodied, so he took his shirt off and put on a shirt belonging to the victim and

10  left his shirt at her apartment.  (*Id*. at 134).  The police obtained Petitioner's tape recorded

11  statement after his arrest and advisement of his *Miranda* warnings.  (Ex. B at 7; Ex. O at 166-

12  79).  The jury heard the tape played at trial.  (Ex. O at 169-71).  As part of its verdict, the jury

13  determined that Petitioner did not commit the murder for pecuniary gain, but that he did

14  commit murder in an especially cruel manner.  (Ex. TT at 12-13).

15       During the penalty phase, the jury could not unanimously agree to impose the death

16  penalty and the trial court declared a mistrial.  (Ex. XX at 15, 27).  The State subsequently

17  withdrew its notice to seek the death penalty and Petitioner was sentenced on August 30,

18  2004.  (Ex. C at ¶ 8).

19       **B.    Grounds One Through Five, Seven through Nine and Eleven: Merits**

20            **Analysis**

21            **1.    General Legal Standards**

22       To be eligible for federal habeas corpus relief, a state prisoner must establish that he

23  is "in custody in violation of the Constitution or laws or treaties of the United States."  28

24  U.S.C. § 2254(a).  This Court's analysis of the merits of Petitioner's claims is constrained

25  by the applicable standard of review.  A state prisoner "whose claim was adjudicated on the

26  merits in state court is not entitled to relief in federal court unless he meets the requirements

27  of 28 U.S.C. § 2254(d)."  *Price v. Vincent,* 538 U.S. 634, 638 (2003).  The Antiterrorism and

28

1    Effective Death Penalty Act of 1996 ("AEDPA") imposes a "highly deferential standard for

2    evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997), and

3    "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*,

4    537 U.S. 19, 24 (2002) (*per curiam*).   Under AEDPA, this Court cannot grant habeas relief

5    unless the state court decision was: (1) "contrary to, or involved an unreasonable application

6    of, clearly established Federal law, as determined by the Supreme Court of the United

7    States;" or was (2) "based on an unreasonable determination of the facts in light of the

8    evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(1), (2).

9        Under § 2254(d)(1), a federal habeas court may not issue a writ, unless the state court

10    decision was either: (1) "*contrary to* ... clearly established Federal law, as determined by the

11    Supreme Court of the United States," or (2) "*involved an unreasonable application of* ...

12    clearly established Federal law, as determined by the Supreme Court of the United States."

13    *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000) (emphasis in original).   A state court

14    decision will be contrary to clearly established federal law if the state court applied the

15    wrong legal rule or applies the correct precedent but on facts indistinguishable from a

16    Supreme Court case reaches a different result.  *Id*. at 405-06, 412.   A state court decision is

17    an unreasonable application of clearly established federal law when that decision "correctly

18    identifies the governing legal rule but applies it unreasonably to the facts of a particular

19    prisoner's case."  *Id*. at 407-08, 412. For a federal court to find a state court's application of

20    Supreme Court precedent "unreasonable," the petitioner must show that the state court's

21    decision was not merely incorrect or erroneous, but "objectively unreasonable."  *Id*. at 409;

22    *Schriro v. Landrigan*, 550 U.S. 465,  473-74 (2007); *Visciotti*, 537 U.S. at 25.

23        Under § 2254(d)(2), the federal court reviews purely factual questions that were

24    resolved by the state court. *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004).  "[T]he

25    question on review is whether an appellate panel, applying the normal standards of appellate

26    review, could reasonably conclude that the finding is supported by the record."  *Id*.

27    Subsection (d)(2) "applies most readily to situations where petitioner challenges the state

28

court's findings based entirely on the state record.  Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence, ... that the process employed by the state court is defective ... or that no finding was made by the state court at all." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) (internal citation omitted), *abrogated on other grounds by Murray v. Schriro,* 745 F.3d 984, 999-1000 (9th Cir. 2014).  Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).   A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor*, 366 F.3d at 999.  In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence."  28 U.S.C. § 2254(e) (1); *Landrigan*, 550 U.S. at 473-74; *Miller-El II*, 545 U.S. at 240.

When applying AEDPA's standards, the federal court reviews the "'last reasoned decision' by a state court addressing the issue at hand." *Miles v. Ryan,* 713 F.3d 477, 486 (9th Cir. 2012) (citation omitted).  The Court considers, Petitioner's claims in view of these standards.

## 2.  Ineffective Assistance of Counsel

The United States Supreme Court held in *Strickland v. Washington,* 466 U.S. 668 (1984), that to establish ineffective assistance of counsel, a defendant must show that "counsel's representation fell below an objective standard of reasonableness" and that he was prejudiced by counsel's deficient performance. *Id.*, 466 U.S. at 687-88.  An ineffective assistance claim must satisfy both prongs of *Strickland*. *Id*., 466 U.S. at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed").  A petitioner must affirmatively prove prejudice. *Id*. at 693.  To demonstrate prejudice, the petitioner "must show that there is a reasonable probability

1  that, but for counsel's unprofessional errors, the result of the proceeding would have been

2  different.  A reasonable probability is a probability sufficient to undermine confidence in the

3  outcome."  *Id*. at 694.   Petitioner bears the burden of showing the state court applied

4  *Strickland* to the facts of his case in an objectively unreasonable manner. *See Bell v. Cone*,

5  535 U.S. 685, 698-99 (2002).

6           **3.     Discussion**

7           **(a)     Grounds Two Through Four and Eleven: Petitioners' Ineffective**

8                      **Assistance of Trial Counsel Claims**

9           **Ground Two: Alleged Failure to Investigate Blood Pattern Evidence**

10          Petitioner asserts that trial counsel was ineffective for not investigating "blood

11  pattern" evidence that he contends "showed ... [he] did not come in contact with [the

12  victim's] blood until after she died."  (Am. Pet. at 7).  Petitioner contends there was no

13  spatter pattern on his t-shirt as would be expected if the killer was wearing it while stabbing

14  the victim.  (*Id*.).  Petitioner refers to the testimony of his purported expert on blood patterns,

15  Michael Sweedo, who testified at the post-conviction evidentiary hearing regarding the blood

16  on Petitioner's jeans that the blood was on the carpet a period of time before Petitioner knelt

17  into it.  (*Id*.). Petitioner contends that "Sweedo concluded that 'the blood patter[n] evidence

18  does not support Mr. Gay being the perpetrator in this matter.'" (*Id*.). Petitioner contends that

19  there was blood spatter evidence that was not analyzed.  (*Id.*).

20          Respondents argue that Petitioner's clothes bore large amounts of the victim's blood

21  and Sweedo testified "that (1) micro-droplet spattering is not inevitable in stabbing cases, and

22  (2) the 'pooled' blood found on Petitioner's jeans [was] consistent with Petitioner kneeling

23  into the victim's blood pool while removing her jewelry after killing her, which the evidence

24  at trial indicated he did."  (Answer at 7-8).  Respondents contend that the Arizona courts

25  acted reasonably in rejecting this claim.  (*Id*. at 8).

26          Petitioner states in his Reply with respect to Ground Ten that he submitted Sweedo's

27  expert report as an exhibit "to [his] PCR brief."  (Reply at 8-9).  Respondents point out in

28

1    their Supplemental Memorandum that Sweedo's report was not attached as an exhibit to

2    Petitioner's PCR petition or to his "PCR brief." (Doc. 24 at 6). Respondents have attached

3    the report as an exhibit to their Supplemental Memorandum. (Doc. 24, Ex. 15, Case Review

4    of Latent Print Examiner dated Dec. 29, 2008). Sweedo opined in the report that "[t]he blood

5    spatter evidence does not support Mr. Gay being the perpetrator in this matter." (*Id*.).

6          Petitioner raised the ineffectiveness issue regarding blood pattern evidence in his PCR

7    Petition filed in the state trial court (Ex. F at 33-34) and an evidentiary hearing was held on

8    the merits. (Ex. Q). Petitioner's counsel argued that the t-shirt found at the scene had the

9    victim's blood on it but there was no spattering pattern as would be expected if the shirt had

10    been worn by the assailant when stabbing the victim. (Ex. F at 33-34). Counsel argued that

11    the jeans found at Petitioner's apartment were soaked at the knees with the victim's blood

12    as could possibly have occurred if he had found the victim's body and leaned next to her to

13    determine if she was still alive. (*Id*. at 34).

14          During the evidentiary hearing, Michael Sweedo, a criminal investigator for the Pima

15    County Legal Defender's Office, testified about the t-shirt and jeans based on photographs

16    of the evidence and reports. (Ex. Q at 8, 15-22). Sweedo testified that there was no aspirated

17    blood spatter on the t-shirt, explaining that "[i]n the process of stabbing somebody, [he]

18    would expect to have found blood stain spatter patterns on the front of the shirt." (*Id*. at 16-

19    20). He described blood spatter as "small round type drops or oval type drops, like on the

20    front of the shirt if it came from the surface that impacted on the shirt." (*Id*. at 21). He

21    described "aspirated blood" as being airborne from a person's breath that would land on the

22    shirt and create a series of small dots. (*Id*.). The blood patterns Sweedo found on the t-shirt

23    were "swipes, wipes and what's called compression transfer." (*Id*. at 55).

24          Sweedo testified that the blood on the knees of the jeans was "solid in nature," that

25    is, "there's a spot of blood where the knee came down into a pool of blood" which was

26    consistent with kneeling into or onto the stain. (*Id*. at 22, 25). Sweedo opined that the blood

27    was on the carpet before Petitioner put his knees into the blood and that there would not have

28

1   been blood on the carpet before or when the victim was stabbed.  (*Id*. at 26-28).  Sweedo

2   described the blood transfers on the jeans as "[t]ransfers with some swipes like in the pocket

3   area like someone put their hands inside the pockets."  (*Id*. at 55).

4          On cross-examination by the State, Sweedo acknowledged that blood spatter may not

5   always be present when a person is stabbed.  (*Id*. at 32).  He testified that the crime scene

6   photographs he examined did not show any significant blood spatter and that it was not

7   unusual not to see blood spatter on the t-shirt.  (*Id*. at 32-34).  Sweedo testified that blood

8   spatter is dependent on the angle of the knife and that any marks on the t-shirt could have

9   been the result of swiping the knife.  (*Id*. at 34-35).  He testified that the blood on Petitioner's

10  jeans was consistent with Petitioner having knelt into the victim's blood pool while removing

11  her jewelry after she was deceased.  (*Id*. at 30).  Sweedo agreed that the fact that there was

12  no spatter on the t-shirt, only with the blood stains on the jeans, did not mean that Petitioner

13  was not the killer.  (*Id.* at 42-43). When questioned by the trial court as to whether the marks

14  on the t-shirt occurred when the shirt was on or off the person, Sweedo answered that he

15  "saw nothing to indicate either way." (*Id*. at 57-58).

16         The State trial court rejected Petitioner's claim of counsel's alleged ineffectiveness

17  for lack of  investigation by applying the two-pronged *Strickland* analysis and based on its

18  review of the trial evidence and evidentiary hearing testimony.  (Ex. H at 1, 3).  The court

19  noted Sweedo's testimony that expired blood is not always seen and "[f]or blood aspirate

20  to be present on an item, the item must be directly in front of the person whose mouth is

21  expiring blood."  (*Id.* at 3).  The court observed that "[e]xpired blood was found on the

22  telephone" and it was unknown "what position the shirt was in or if it was even on the

23  assailant at the time of the stabbing, " with Sweedo "assuming that the murderer was wearing

24  the shirt."  (*Id*.).  The trial court noted that defense counsel had "vigorously cross-examined

25  Mark [sic] Taylor and Norman Reeves regarding the blood evidence at the scene and on

26  clothing seized from the Defendant."  (*Id*.).  In finding that Petitioner had failed to meet his

27

28

burden of proving ineffective assistance of counsel based on the blood spatter issue, the court

stated:

> **THE COURT FINDS** that Petitioner has failed to prove that actions of trial counsel in presenting testimony proffered by Mr. Swedo [sic] was unreasonable and fell below an objective standard of reasonableness for trial counsel. Trial counsel consulted with many experts and undertook copious analysis in the case over a three year period of time.
>
> Thus, the Petitioner failed to meet the burden of prong one. Even if he could meet the prong one burden, the Petitioner has failed to show that the outcome of the trial would have been different. As the Court noted the evidence presented as to the Petitioner's guilt was strong, including DNA evidence, blood evidence, various witnesses, evidence of the victim's stolen property having been pawned or given to others, and contradictions in the Petitioner's statement.

(*Id.*).

Petitioner raised the issue of counsel's failure to properly investigate blood spatter evidence in seeking review before the Arizona Court of Appeals. (Ex. I at 17-18). The State appellate court granted review but denied relief without discussing the issue (Ex. A), therefore leaving the trial court's ruling the last reasoned decision on the matter.

It is the general duty of a defense attorney to make reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary. *See Strickland*, 466 U.S. at 691; *Cullen v. Pinholster*, 563 U.S. 170, 195-96 (2011). "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Strickland*, 466 U.S. at 691. "In assessing the reasonableness of an attorney's investigation ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

Defense counsel was not deficient for failing to more thoroughly investigate blood spatter evidence. Mr. Swedo's testimony regarding the lack of blood spatter on the t-shirt and jeans was inconclusive and not exculpatory. Swedo acknowledged that blood spatter may not always be present when a person is stabbed, that the photographs of the crime scene

1  he examined did not show any blood spatter, that it was not unusual to not see blood spatter

2  on the t-shirt, and that blood spatter is dependent on the angle of the knife.

3       The prosecutor noted at the evidentiary hearing that "[t]his was not a blood spatter

4  case. The victim bled out primarily about her head and neck." (Ex. Q at 62). During trial,

5  State's witness Norman Reeves, a forensic consultant who specializes in blood stain pattern

6  analysis, testified about the various blood patterns observed at the scene based on

7  photographs, physical evidence, and laboratory and police reports. (Ex. P at 148- 95). Mr.

8  Reeves testified that the victim's stab wounds about the neck area showed passively flowing

9  blood. (Ex. P at 160-63, 182). He described blood patterns as passively flowing blood which

10  is the result of gravity; medium velocity impact spatter as generally akin to beatings; and

11  high velocity impact spatter as generally the result of a gunshot. (*Id*. at 155). Reeves testified

12  about a "relatively small spatter" of blood, but said it was unknown what caused the spatter,

13  noting that "one of the things you don't get in a stabbing, and that is spatter." (*Id*. at 178-81).

14  Reeves clarified that "unless the hand is so close to the body when it strikes with a knife it's

15  already bloody, they'll be some spatter." (*Id*. at 181).

16       Defense counsel presented the trial testimony of Marc Taylor, a forensic scientist and

17  blood spatter analyst who testified about the blood stains on the t shirt and pants. (Ex. MM

18  47-64; Ex. OO at 5-113 ). He testified about the blood stains on the t-shirt and pants coming

19  in contact with a bloody object. (Ex. OO at 11-15, 76-79). Mr. Taylor was not questioned

20  about blood spatter at the scene. Mr. Taylor testified in response to a juror question that

21  blood pattern analysis is not an exact science. (Ex. OO at 111-12). He answered "no" when

22  asked if pictures can provide an exact representation, explaining that "it is possible in a

23  picture to have something that looks like blood that isn't actually blood." (*Id*. at 112). In

24  contrast, Mr. Sweedo's testimony at the evidentiary hearing was based on his review of

25  photographs of the crime scene and reports.

26       A defense counsel is not required to pursue an investigation that would be fruitless or

27  might be harmful to the defense. *See Harrington v. Richter*, 562 U.S. 86, 106-08  (2011).

28

1  Petitioner has not established that counsel's failure to more thoroughly investigate blood

2  pattern evidence was an omission that fell below an objective standard of reasonableness or

3  that the outcome of trial would have been different based on Sweedo's testimony. The state

4  court's ruling denying Petitioner's ineffective assistance of counsel claim on this issue is not

5  contrary to, or an unreasonable application of, clearly-established federal law as determined

6  by the Supreme Court. Ground Two is denied.

7  **Grounds Three and Four: Issues Related to Defense Witness Popenko**

8  **Ground Three:** Petitioner asserts in Ground Three that trial counsel ineffectively

9  failed "to investigate and uncover exculpatory evidence showing that Maksim Popenko [the

10  victim's ex-boyfriend] was the actual killer." (Am. Pet. at 8). Petitioner claims that

11  counsel's further investigation would have disclosed that Brandon Barnes, "Popenko's 'best

12  friend'... who had dated [the victim] after [Popenko]", stated in an interview that he

13  suspected Popenko because he had noticed the day after the murder that Popenko possessed

14  a photograph that Barnes had tried to retrieve from the victim, and that Barnes did not believe

15  Popenko's explanation about how he had obtained the photograph. (*Id.*). Petitioner

16  contends that after Barnes' death, the PCR investigator interviewed Barnes' fiancee, Shannon

17  Moon, who said that Barnes believed Popenko killed the victim, that Barnes had seen

18  Popenko beat up other women, and that Popenko and Barnes were both members of the

19  eastside Bloods. (*Id.*).

20  Respondents argue that Petitioner's claim is vague and mere speculation by Barnes

21  while Petitioner's guilt was established by the trial evidence, including fingerprint, semen

22  and blood evidence, and the items Petitioner took from the victim. (Answer at 8).

23  Respondents contend that any investigation regarding Popenko would have been futile. (*Id.*).

24  **Ground Four:** Petitioner asserts in Ground Four that counsel was ineffective for

25  failing to effectively cross-examine Popenko, a hostile witness and the purported actual

26  killer. (Am. Pet. at 9). Petitioner contends that shortly after the murder, Popenko was

27  arrested in California in possession of a gun and machete in his car and pleaded guilty. The

28

trial court allowed defense counsel to impeach Popenko about the conviction without reference to the weapons, but counsel failed to do so.  (*Id*.).  Petitioner also faults counsel for not impeaching Popenko about wearing red pants at the time of his arrest despite testimony from a trial witness that she saw a person wearing red pants or shorts who resembled Popenko standing outside the victim's apartment in the early hours after the murder.  (*Id*.).  Popenko allegedly denied owning or wearing red pants or shorts even though he allegedly was wearing red pants when arrested in California.  (*Id*.).

Respondents argue that impeaching Popenko about a matter as tangential as a prior weapons conviction would not have changed the result of trial, given the voluminous evidence presented against Petitioner.  (Answer at 8).  Respondents contend that Petitioner has not shown resulting prejudice as the Arizona courts reasonably found.  (*Id*.).

**Discussion:**  In his PCR Petition, Petitioner asserted that defense counsel was ineffective for "failure to investigate."  (Ex. F at 30).  After noting that Petitioner's "secondary defense" at trial "was a third-party culpability defense that focused on Maksim Popenko as the guilty party," Petitioner argued that Brandon Barnes had said in an interview that he suspected Popenko killed the victim, but Barnes died in 2006 without defense counsel investigating the matter.  (*Id*. at 31).  Petitioner contended that Barnes would have said he went to the victim's apartment the day before the murder to pick up a photograph, the two argued, and Barnes left without the photograph.  (*Id*. at 31-32).  Barnes also would have stated that the day after the victim's death, he saw the photograph while talking to Popenko who was in or at his car, and asked Popenko where he got the photograph but did not believe his explanation.  (*Id*. at 32).  Barnes allegedly observed that Popenko's car was full of chocolate wrappers of a kind of chocolate the victim favored and kept in her home.  (*Id*.).  Petitioner argued that these circumstances, and that Popenko (a former boyfriend) was not over the victim, made Barnes suspicious.  (*Id*.)  PCR counsel also asserted in the PCR Petition filed in the trial court that defense counsel was ineffective for not impeaching Popenko with his prior California conviction for possession of a firearm even though the trial

1   court allowed the questioning on the condition of no mention of the weapons. (Ex. F at 26-

2   27).  PCR counsel asserted that Popenko testified at trial that he did not own or wear red

3   pants when  Popenko had been arrested in California and was wearing enough red for the

4   police to suspect that he was a gang member.  (*Id.*  at 32-33).

5      The state trial court found that counsel's "not adequately investigating Popenko as the

6   culpable third party" and the impeachment issue should be considered at the evidentiary

7   hearing.  (Ex. G at 8; Ex. Q at 4-5). Prior to the February 1, 2010 evidentiary hearing, the

8   trial court ruled at a hearing on December 9, 2009 that Ms. Moon's testimony regarding

9   Barnes' statements to her was precluded at the evidentiary hearing.  (Ex. BBB, internal ex.

10  8 at 2-8 Dec. 9, 2009 Tr.).

11     During the evidentiary hearing, PCR counsel argued that Popenko admitted he was

12  present at the victim's apartment on the night of the murder, that defense counsel "could have

13  presented  more  evidence  that  would  have  supported  his  third  party  culpability  theory

14  defense," and that a resident of the apartment complex where the murder occurred testified

15  "about the guy in the red pants that was there in front of [the victim's] door that morning."

16  (Ex. Q at 59-60).  PCR counsel emphasized that Popenko had  been "less than forthright on

17  the stand about his history with [the victim], denying the order of protection and the threats

18  that  he  made  on  the  phone,  even  though  they  had  the  voice  mails  and  stuff  that  clearly

19  showed that he had been calling her and threatening her."  (*Id.* at 60-61).  PCR counsel

20  described Popenko as "a jealous ex-boyfriend" who "clearly had a motive" and that defense

21  counsel's failure to impeach Popenko with these items of evidence could not be dismissed

22  as harmless.  (*Id.*).

23     The State prosecutor argued that the evidence showed that Popenko had visited the

24  apartment  earlier  on  the  night  of  the  murder,  "everything  was  consistent  with  what  he

25  indicated had happened in that he went and picked up or delivered a CD from [the victim],"

26

27

28

1   and Popenko's semen or blood was not found at the scene   (*Id*. at 64).[2]   The prosecutor

2   argued that Petitioner could not show prejudice from defense counsel's alleged errors when

3   considered against the strong trial evidence of Petitioner's guilt and Petitioner's inconsistent

4   statements to authorities.  (*Id*. at 63-66).

5          The trial court ruled that Petitioner had "failed to show" that defense counsel's failure

6   to cross-examine Popenko about his prior felony conviction "was anything more than a

7   strategic or tactical decision" and that "given the strong weight of all of the evidence against

8   Petitioner, had Mr. Popenko's felony conviction been brought to light, it would have had no

9   effect on the outcome. [Petitioner] would have undoubtedly been convicted."  (Ex. H at 2).

10  The trial court found that defense counsel had "vigorously cross-examined Mr. Popenko ...

11  he called Brandon Barnes to offer testimony to discredit Mr. Popenko and to implicate Mr.

12  Popenko in the homicide."  (*Id*.).

13         In his Petition for Review filed before the Arizona Court of Appeals, Petitioner

14  asserted that trial counsel was ineffective in cross-examining Popenko and in conducting the

15  crime scene investigation. (Ex. I at 11).  Petitioner cited defense counsel's failure to impeach

16  Popenko with his prior felony conviction.  (*Id*. at 11-13).  Petitioner did not assert any issue

17  about Popenko's alleged red clothing.  As part of the failure to investigate claim, Petitioner

18  reiterated the circumstances of the post-conviction investigation about Barnes' suspicion of

19  Popenko as the murderer and Barnes' statements to Shawna Moon.  (Ex. I at 14-15).

20  Petitioner contended that he had filed the appropriate motion in the state trial court under the

21  residual exception to the hearsay rule seeking the admission of these facts through Ms. Moon

22  but the trial court ruled the evidence inadmissible.  (*Id*.).  Petitioner argued that Barnes'

23  statements should have been considered trustworthy, that Barnes was not considered a

24  suspect, and that there was no other way to procure the evidence except through Moon's

25  

---

26         [2] Stephanie Lozano testified that on the evening of the victim's death, the victim left
27  for ten minutes to give a CD to Popenko.  (Ex. K at 77-79).  Detective Jimenez testified that
    when he interviewed Popenko at approximately 1:15 a.m. on April 11, 2001, he did not see
28  any injuries on his hands, face or body.  (Ex. L at 227-29).

testimony. (*Id*. at 16). Petitioner contended that the evidence was essential to his constitutional right to present a defense under the Fifth and Sixth Amendments, citing Supreme Court cases. (*Id*. at 16-17).

The Arizona Court of Appeals noted in its Memorandum Decision granting review but denying relief that Petitioner had raised in the state trial court his claim that his trial attorneys were ineffective in pursuing a third-party culpability defense in part because they "did not fully investigate evidence related to the possible culpability of a third party, P., ... and failed to impeach P.'s testimony with his previous conviction." (Ex. A at ¶ 3). The State appellate court ruled that the trial court had "correctly rejected" Petitioner's claim of ineffective assistance of trial counsel "in thorough and well-reasoned minute entries" and that "[n]o purpose would be served by restating the court's analysis here." (*Id*. ¶ 5). The appellate court discussed in a footnote Petitioner's claim that counsel was ineffective for failing to investigate evidence relating to his third-party culpability defense, indicating that the issue raised in the trial court was not the same as the issue raised in the petition for review:

> Gay's petition for review contains a section heading that reads 'Failure to investigate.' But the majority of his argument in that section does not discuss his trial counsels' purported failure to investigate evidence relating to his third-party culpability defense. Instead, his argument appears to assert the trial court had erred in excluding testimony related to his third-party culpability defense, a claim that, even if not precluded, see Ariz. R. Crim. P. 32.2(a), was not raised below. *See State v. Ramirez*, 126 Ariz. 464, 468, 616 P.2d 924, 928 (App. 1980) (appellate court will not consider on review claims not raised below); see also Ariz. R. Crim. P. 32.9(c)(1)(ii) (petition for review must contain 'issues which were decided by the trial court and which the defendant wishes to present to the appellate court for review').

(Ex. A ¶ 5, n. 1).

The state court record shows that the trial court ruled pretrial that testimony concerning a machete in Popenko's car or that he was wearing "'gang'" colors when arrested in California was precluded. (Ex. AAA, internal ex. 9 June 24, 2002 Min. Entry at 4). Defense counsel called Popenko as a witness and Popenko admitted that he had had a relationship with the victim, that they had broken up in 1999, and that he had falsely told

authorities when initially interviewed at around 1:25 a.m, on April 11, 2001 that he had not been present at her apartment on the night of her death.  (Ex. LL at 43-45, 67-77, 120). Popenko testified that he, in fact, had been to the victim's apartment on the night of the murder (April 9, 2001) until midnight or 1:00 a.m. to get a CD.  (*Id*. at 75-77, 121).  Defense counsel elicited from Popenko that in April 2001 he possibly "owned several guns" and that he told the police in April 2001 that he carried a knife.  (*Id*. at 177-78).  When questioned by the State, Popenko described the knife as a machete.  (*Id*. at 179).  Also when questioned by the State, Popenko testified that had gotten upset with the victim over her keeping a lock of his hair and that he may have left some "nasty messages" on her answering machine around August 2000.  (*Id*. at 183-87).  When questioned by defense counsel, Popenko said he did not recall leaving threatening messages on the victim's answering machine in August 2000.  (*Id*. at 51-52).

Defense counsel called Brandon Barnes as a witness who testified that he told the police when interviewed on April 11, 2001 at 2:04 a.m. that Popenko had been present at the victim's apartment on April 9, 2001.  (Ex. LL at 215-19).  Barnes also testified that after being interviewed by the police, he called Popenko and told him the officer was going back to speak with Popenko and that he (Barnes) was not "going to hide anything that you want me to."  (*Id*. at 220-21).

With respect to the "red clothing" issue, defense counsel called at trial a woman who lived in the same apartment complex as the victim, who testified that around 7:00 or 7:30 a.m., on April 10, 2001, she saw standing in front of the victim's apartment door a man described as tall, slender, dark hair with white complexion wearing red "sports pants."  The witness did not see the man from the front and did not see his face.  (Ex. LL at 96-107, 112). The woman testified that when shown a photograph of Popenko by an investigator in October 2002, she had stated that Popenko's haircut was not the same as the haircut of the man she saw.  (*Id*. at 108-10).  She acknowledged that the police report indicated she was unsure whether she saw the man on April 10, 2001 or the previous morning but that she believed it

1    was April 10th. (*Id*. at 106-07, 112-13). When questioned by defense counsel at trial, Popenko
2    acknowledged that a photograph of him taken by the police when he was interviewed on
3    April 11, 2001 showed he was wearing a red jersey.  (*Id.* at 115-117).  He testified that he
4    owned a lot of red clothing.  (*Id*.).  Popenko denied owning any red pants, but said he might
5    have owned such pants "at the time."  (*Id*. at 117).  He agreed that he previously told defense
6    counsel during the interview that he was wearing "red DKY" shorts. (*Id*. at 118-19).
7    Popenko testified when questioned by the State,  "I have had several pair of red pants."  (*Id*.
8    at 132).

9         Regarding Ground Four, the state trial court's ruling that defense counsel was not
10   ineffective in cross-examining Popenko, the last reasoned decision on the issue, is not
11   contrary to Supreme Court precedent.  Petitioner has not shown prejudice from any omission
12   by counsel.  Counsel effectively brought before the jury Popenko's testimony that he had
13   been present at the victim's apartment on the night of the murder, his inconsistent statements
14   to the authorities, his inconsistent statements regarding the telephone messages left with the
15   victim related to the lock of hair incident, the fact that Popenko possessed a machete, and the
16   fact that he owned and wore red clothing at the time of the murder.  Counsel's further
17   impeachment of Popenko with his California felony conviction would not have added to the
18   jury's assessment of Popenko's credibility or shown that Popenko was the actual murderer.
19   The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to
20   eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's
21   challenged conduct, and to evaluate the conduct from counsel's perspective at the time."
22   *Strickland*, 466 U.S. at 689. To satisfy *Strickland's* first prong, deficient performance, a
23   defendant must overcome "the presumption that, under the circumstances, the challenged
24   action might be considered sound trial strategy."  *Id*.

25       With respect to Ground Three, Barnes' alleged statement to his girlfriend that he
26   suspected Popenko as the murderer was vague and speculative.  It is not the type of alleged
27   exculpatory evidence that would lead a reasonable attorney to investigate further in light of

28

the other evidence known by defense counsel. *Wiggins*, 539 U.S. at 527. Barnes' testimony that he told the authorities that Popenko had been present at the victim's apartment on the night of the murder and that he would not hide anything from the authorities about Popenko cast Popenko as the possible assailant in light of all the evidence, including defense counsel's questioning of Popenko at trial. Moreover, as the Arizona Court of Appeals found in rejecting this claim, Petitioner raised the issue as a claim of defense counsel's failure to investigate in the state trial court but then changed the theory to an evidentiary issue in his petition for review. "Evidentiary rulings based on state law cannot form an independent basis for habeas relief." *Jammal v. Van De Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). Petitioner's Grounds Three and Four are denied.

### Ground Eleven:  Petitioner's Alleged Invocation of his Right to Counsel

Petitioner contends that trial counsel ineffectively failed to object to the prosecutor's comments during closing argument that allegedly referred to Petitioner's invocation of his right to counsel. (Am. Pet. at 18). Petitioner cites the following comments by the prosecutor during closing argument:

> And, ladies and gentlemen, when Anthony Gay did request an attorney at the end of that statement, you saw what the police did. They immediately heard the request, they stopped asking any and all questions immediately upon his request for an attorney.

(*Id.*; *See* Ex. PP at 96). Petitioner contends that the prosecutor's comments "caused the jury to infer that [he] was guilty because [he] wished to stop answering questions and talk to a lawyer." (Am. Pet. at 18). Respondent contends that, as the state trial court found, the prosecutor's "isolated and glancing reference" to Petitioner's invocation was "wholly harmless" in light of the evidence of Petitioner's guilt. (Answer at 9).

Petitioner raised this issue in his PCR Petition filed in the state trial court. (Ex. F at 27-30). The trial court rejected the claim, finding first that the proper standard of review was a showing of "fundamental error" because Petitioner failed to object during the trial proceedings, citing *State v. Henderson*, 115 P.3d 601, 607 (Ariz. 2005). (Ex. G at 6-7). The trial court further found that Petitioner "'must show that the error complained of goes to the

foundation of his case, takes away a right that is essential to his defense, and is of such

magnitude that he could not have received a fair trial'" based on *Henderson*. (*Id*. at 7).  The

trial court set forth its rationale for denying the claim as follows:

> In the instant case, the jury did not need to rely on the credibility of the arresting officer.  As described throughout this ruling, the evidence presented to the jury to prove the [Petitioner's] guilt was substantial.  The [Petitioner's] conversation with police *before* he invoked his right to counsel was admissible and was significant evidence showing he was at the scene of the murder.  This evidence was heard by the jury before closing arguments and thus the State's statement about the [Petitioner] invoking his right to counsel was at that point in the trial a harmless error.  In fact, the entire statement to the police was admitted and defense counsel argued that the statement was involuntary because the police led the [Petitioner] to believe that if he requested counsel, he would go to jail. The record does not support the assertion that the State had a deliberate trial strategy to expose the [Petitioner's] request for counsel in an effort to prejudice him having invoked a constitutional right.  Due to the ample evidence against the [Petitioner], the State's mention in closing argument of the [Petitioner's] request for counsel is not fundamental error and would not have altered the outcome of trial.  Thus, counsel's failure to object to the State's comment in closing argument was not ineffective assistance of trial counsel.

(Ex. G at 7-8).

Petitioner's assertion of the claim in seeking review by the Arizona Court of Appeals

was rejected based on the trial court's "thorough and well-reasoned minute entries" without

further discussion.  (Ex. A at 3-4).  The trial court's ruling therefore is the last reasoned

decision on the issue.

A prosecutor's alleged improper argument does not per se violate a defendant's

constitutional rights.  *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993).  "[I]t 'is not

enough that the prosecutors' remarks were undesirable or even universally condemned.'"

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  The question is whether the "prosecutors'

comments 'so infected the trial with unfairness as to make the resulting conviction a denial

of due process.'"  *Id*. (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

During opening statement at trial, defense counsel told the jury that Petitioner was

arrested and "driven down to the police station where he was pulled into a room to be

questioned by two detectives," that Petitioner "asked for an attorney," and that his "request

was ignored by the police detectives.  He was told if he wanted to speak to an attorney he

1    would be charged with first degree murder and he would go to jail." (Ex. K at 32).

2    Petitioner's tape recorded statement to the police was played for the jury. (Ex. HH at 168-

3    71). The State elicited at trial through Tucson Police Detective Lorraine Thompson that when

4    making a statement, Petitioner had asked when he was going to get an attorney. (Ex. HH at

5    175).   Detective Thompson testified that when Petitioner requested an attorney, the

6    questioning ended.  (*Id*. at 178-79).

7         During closing argument, the prosecutor made only a brief reference to Petitioner's

8    request for an attorney  in an effort to make the point that police officers ceased questioning

9    him and thereby preserved his rights. Petitioner's contention that the jury inferred from the

10   comment that he was guilty because he desired an attorney is speculation.  Defense counsel

11   commented in closing argument that Petitioner asked Detective Olivas "when can I have an

12   attorney appointed" and was "informed if he wants to speak to an attorney, doesn't want to

13   speak to the police officer right then, that he is going to be arrested for first degree murder,

14   he's going to be taken to jail and he, maybe 7 or 10 days after that ... he'll get to talk to an

15   attorney." (Ex. PP at 145).  Defense counsel made the point in closing argument that "the

16   detectives repeatedly lie[d] to [Petitioner]."  (*Id*.).

17        Under these circumstances, and in the context of the evidence establishing Petitioner's

18   guilt, Petitioner has not shown that he was denied a fair trial based on the prosecutor's

19   comment during closing argument and defense counsel's failure to object to those remarks.

20   Petitioner's allegation is not sufficient to overcome "the presumption that, under the

21   circumstances, the challenged action might be considered sound trial strategy." *Strickland*,

22   466 U.S. at 689.

23        The trial court instructed the jury that what the attorneys said in opening statement and

24   closing argument is not evidence. (Ex. PP at 25).  The jury is presumed to follow the court's

25   instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  Petitioner has not established

26   that the state trial court's ruling denying his claim of ineffective assistance of counsel is

27   contrary to Supreme Court precedent.  Ground Eleven is denied.

28

**(b)    Grounds Five and Nine: Ineffective Assistance of Appellate Counsel**

Petitioner's two grounds that appellate counsel provided ineffective assistance are evaluated under the *Strickland* standard discussed above. *See Williams*, 529 U.S. at 390-91.

**Ground Five: Failure to Raise Sufficiency of the Evidence on Appeal**

In Ground Five, Petitioner faults appellate counsel for failing to argue that the evidence was not sufficient to convict him of first degree burglary, and felony murder on the basis of burglary and theft. (Am. Pet. at 12).  Petitioner cites as significant that all jurors rejected felony murder for burglary, with sexual assault as the basis for the burglary; and that the jury unanimously rejected the aggravating factor of pecuniary gain. (*Id*.).  He also asserts that the State "conceded that his entry into the apartment was lawful" and that "there was no evidence from which a reasonable juror could infer" that he took items from the victim during his "unlawful presence."  Petitioner argues that the "only reasonable inference that a jury could draw" was that Petitioner took items "as an afterthought" and that his "intent to steal would have been formed after the alleged homicide." (*Id*.). Petitioner contends that his trial lawyer raised these issues in a motion for new trial[3] and that PCR counsel argued that his appellate lawyer was ineffective for not raising the issues on direct appeal. (*Id*.). Respondents argue that the trial evidence established not only that Petitioner murdered the victim but also stole her jewelry and other possessions, and that any insufficient evidence claim raised on direct appeal would have failed. (Answer at 9-10).

Petitioner did not raise insufficiency of the evidence on direct appeal.  PCR counsel asserted in the PCR Petition that appellate counsel was ineffective for this omission. (Ex. F at 12- 19).  The state trial court rejected the claim, ruling as follows:

> Since the nature and degree of the evidence presented at trial supports a claim of sufficient evidence for a felony murder conviction, with the predicate felony being burglary, appellate counsel was not erroneous in not finding or not making such a claim.  Simply because the jury did not unanimously find that pecuniary gain was an aggravating factor during the penalty phase of the trial is of no import.  For burglary to be a basis for felony murder, the jury must

---

[3] Petitioner's motion for new trial was considered and denied at a hearing on June 28, 2004. (Ex. AAA, Motion for New Trial filed May 10, 2004 &  June 28, 2004 Tr.).

1  only find that the death occurred during the course of or in furtherance of the
2  burglary.  There was substantial evidence the victim's death occurred during
   the course of or in furtherance of the burglary.  Therefore, the [Petitioner's]
3  claim of ineffective assistance of appellate counsel for not raising a claim of
   ineffective assistance of trial counsel in this regard is without basis and must
4  fail.

5  (Ex. G at 6).

6      The appellate court rejected the claim as raised in the Petition for Review:

7      Gay asserts the trial court erred by rejecting his claim that appellate counsel
       had been ineffective for failing to argue the evidence of felony-murder was
8      insufficient.  He contends the jury's finding of burglary 'must have been based
       on his intent to commit a theft, which was formed after the homicide.'  Thus,
9      he reasons, because the murder therefore did not occur 'in furtherance of' the
       burglary, burglary 'could not provide the basis for a felony-murder
10     conviction.'  *See* A.R.S. § 13-1105(A)(2) (person commits first degree murder
       by causing death of another 'in the course of and in furtherance of' enumerated
11     offenses).  But Gay does not support his assertion that his intent to commit
       theft was formed after the homicide had been committed; he provides no
12     citation to the record or to the documents contained in the appendix to his
       petition for review.  *See* Ariz. R. Crim. P. 32.9(c)(1) (petition for review shall
13     contain 'specific references to the record' supporting claims).  Nor does he
       provide references to supporting evidence in his petition for post-conviction
14     relief.  *See* Ariz. R. Crim. P. 32.5 (record citations required in petition for post-
       conviction relief).  Absent such support, he has failed to demonstrate his
15     appellate counsel was ineffective in failing to raise this claim on appeal, and
       the court did not err in summarily dismissing this claim. [footnote omitted].
16     *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (to prevail on
       ineffective assistance of counsel claim, defendant must show counsel's
17     performance deficient under prevailing professional norms and deficient
       performance prejudiced defense).

18  (Ex. A at 4-5).  The appellate court observed in a footnote that the state trial court had

19  misstated the showing for felony-murder, noting that A.R.S. § 13-1105(A)(2) reads "during

20  the course of and in furtherance of the burglary," not "during the course of or in furtherance

21  of the burglary." (*Id*., at 5, n.2).  It was further noted "that the jury was correctly instructed

22  at trial that the victim's death had to be caused 'in the course of and in furtherance of' the

23  burglary" and that it was "presumed the jury followed those instructions." (*Id*.).  Despite this

24  "incorrect recitation of the relevant law," the Court of Appeals found no error in the rejection

25  of this claim "[i]n light of Gay's failure to support his sufficiency of the evidence argument

26  with references to the facts of his case." (*Id*.).  The appellate court's opinion is the last

27  reasoned ruling on the issue.

28

- 25 -

1    Petitioner's grounds asserted in his amended habeas petition do not cite any factual

2    evidence as showing that an insufficiency of the evidence argument would have been

3    successful on appeal regarding the legal issues he has identified. Petitioner's assertions are

4    too "vague and conclusory" to warrant habeas relief on a claim of insufficient appellate

5    counsel. *Moore v. Chrones*, 687 F. Supp. 2d 1005, 1035 (C.D. Cal. 2010).

6    The record shows that Petitioner was charged with first degree murder and burglary

7    in the first degree. (Ex. B at 2; Ex. PP at 31). The trial court instructed the jury that a person

8    can be found guilty of first degree murder based on one or both of two separate theories, that

9    is, the theory of premeditation and the theory of felony murder, and that Petitioner had been

10   charged based upon both theories. (*Id.*). The jury was instructed that the crime of first

11   degree murder by felony murder required proof of the following two things: "One; the

12   defendant committed a burglary or sexual assault; two, in the course of and in furtherance

13   of either of these crimes or immediate flight from either of these crimes, the defendant or

14   another person caused the death of another person." (*Id.* at 32). The jury was further

15   instructed as to the elements of first degree burglary, second degree burglary, theft, and

16   sexual assault. (*Id.* at 33-35). Petitioner was found guilty of first degree burglary and first

17   degree murder. (Ex. A at 2). His murder conviction was based on a theory of felony murder

18   with burglary as the predicate crime. (*Id.*).

19   In Arizona, a person commits burglary in the first degree by "entering or remaining

20   unlawfully in or on a residential structure with the intent to commit any theft or any felony

21   therein" while knowingly possessing a deadly weapon. A.R.S. §§ 13-1508(A); 13-1507(A).

22   While a person may enter another's premises lawfully and with consent, "his presence can

23   become unauthorized, unlicensed, or unprivileged if he remains there with the intent to

24   commit a felony." *State v. Altamirano*, 803 P.2d 425, 428 (Ariz. App. 1990). "'When a

25   person's intent in remaining on premises is for the purpose of committing "a theft or some

26   felony therein," such individual is no more welcome than one who initially entered with such

27   intent.'" *Id.* (quoting *State v. Embree*, 633 P.2d 1057, 1059 (Ariz. App. 1981), *abrogated on*

28

*other grounds by* amendment to A.R.S. § 13-1501(2)).  A person, therefore, may be found guilty of felony murder if, acting either alone or with one or more other persons, the person commits burglary and, in the course of and in furtherance of the offense, the person or another person causes the death of any person. A.R.S. § 13-1105(A)(2).

Generally, for challenges to the sufficiency of the evidence supporting a criminal conviction, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Even if there are conflicting inferences in the evidence, a habeas court "must presume - - even if it does not affirmatively appear in the record - - that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution." *Id*. at 326; *see also Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) (per curiam).  Additionally, when evaluating a *Jackson* claim on federal habeas review, the court must apply 28 U.S.C. § 2254(d)(1)'s "additional layer of deference" by analyzing whether the state's highest court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. *Juan H. v. Allen*, 408 F.3d 1262, 1274–75 (9th Cir.2005).

The trial evidence showed that Petitioner was present at the victim's apartment on the night of the murder, his semen and blood were found on the victim, his blood and fingerprints were found throughout the apartment, his bloody t-shirt was found under the victim, and he was in possession of items belonging to the victim the day after the murder. Petitioner was wearing the victim's t-shirt when he returned to his apartment in the early morning hours of April 10, 2001 and his girlfriend testified that Petitioner said he obtained the shirt from the house he had broken into.  Defense counsel argued in closing argument to the jury that Petitioner engaged in consensual sex with the victim, that he left to get cigarettes, found the victim and cradled her bloody body next to his, and that he took items from her apartment as an afterthought, leaving more expensive items behind . (Ex PP at 118-

36). Defense counsel argued that Maksim Popenko was the possible murderer and that crime was committed in a jealous rage. (*Id*. at 136-43). The jury rejected Petitioner's theory of defense and found him guilty.

It is permissible for appellate counsel to make tactical choices to raise certain claims and not others on direct review. *Smith v. Murray*, 477 U.S. 527, 536 (2000); *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). Counsel's tactical choices are entitled to a strong presumption of correctness. *Strickland*, 466 U.S. at 690. Petitioner has not shown either deficient performance from appellate counsel's omission or resulting prejudice. *Strickland*, 466 U.S. at 689, 694. The Arizona Court of Appeals rejection of his ineffective assistance of appellate counsel claim was not objectively unreasonable in light of Supreme Court precedent and Ground Five is denied.

**Ground Nine: Third Party Culpability**

In Ground Nine Petitioner contends that the state trial court violated his due process rights by precluding evidence of third party culpability, that is, evidence of semen from unknown persons found in the victim's underwear and bed sheets, and evidence that the victim and a female friend had consensual sex with her neighbors in her apartment on the night of her death. (Am. Pet. at 16). Respondents argue this ground as contending that appellate counsel was ineffective for not raising the issue on direct appeal. (Answer at 9, 10). Respondent contends that such evidence only generally pointed to third parties and was properly excluded, the probative value of the evidence was substantially outweighed by the danger it would cause jurors to focus on the victim's prior sexual activity rather than the trial issues, and evidence on this topic would have been futile given the trial evidence that established Petitioner's guilt. (*Id*. at 10).

The issue of the victim's prior sexual activity was not raised on direst appeal but was raised as a claim of ineffective assistance of appellate counsel in the PCR petition filed in the state trial court and in the Petition for Review filed in the Arizona Court of Appeals. (Ex. F at 19-24; Ex. I at 10-11). The state trial court ruled the issue was precluded because it had

1    not been raised on direct appeal. (Ex. G at 15).  The state appellate court determined that the

2    trial court had erred in finding the claim precluded because it had overlooked that Petitioner

3    raised the issue as a claim of ineffective assistance of appellate counsel. (Ex. A at 3, 5).  The

4    Arizona Court of Appeals found that Petitioner was not entitled to relief because the evidence

5    had been correctly ruled inadmissible at trial "in part because it pointed only generally to a

6    third party or parties."  (Ex. A at 5).  The appellate court went on to find that even if that

7    ruling was error, Petitioner had not addressed the trial court's alternative basis for excluding

8    the evidence, to wit, "that its probative value was substantially outweighed by its prejudicial

9    effect because it would improperly 'allow [Petitioner] to focus on the victim's prior sexual

10   contacts without any connection to the events on [the] date in question," citing Ariz. R. Evid.

11   403.  (Ex. A at 6).  This is the last reasoned decision on the issue.

12        The state court record shows the trial court in a pretrial ruling precluded testimony

13   regarding condoms found in the victim's apartment and regarding the victim's consensual

14   activity with Ryan A. (Ex. T at 110-35; Ex. AAA, internal ex. 9 June 24, 2002 Min. Entry).

15   At a hearing on February 24, 2003, defense counsel remarked that the prosecutor had brought

16   a motion to preclude evidence of the victim's consensual sexual activity.  (Ex. X at 76; *see*

17   *also* Ex. X at 27-28).  In another pretrial ruling, the trial court noted that the defense sought

18   to admit specimens of semen samples found on the bedding in the victim's bedroom, on a

19   pair of panties found on the floor of the victim's bedroom, and on the condoms to "'rebut the

20   State's theory of sexual assault'" and to demonstrate that someone else could have committed

21   the murder.  (Ex. AAA, internal ex. 8 Mar. 17, 2004 Min. Entry).  The court ruled the semen

22   sample evidence found on the bedding and panties was not admissible because there was no

23   evidence tying a particular donor to the scene who may have had a motive and/or opportunity

24   to commit the crime.  (*Id*.).  The court further ruled that even if relevant, the danger of undue

25   prejudice outweighed any relevance because "[i]t is clearly inflammatory and unfairly

26   prejudicial to allow the defendant to focus on the victim's prior sexual contacts without any

27   connection to the events on [the] date in question."  (*Id*.).  However, the court ruled evidence

28

1    regarding the condoms was admissible on the issue of third party culpability.  (*Id.*; *see also*
2    Ex. Y at 9).

3          During trial, State's witness, Stephanie Lozano, the victim's neighbor,  testified that
4    on the evening of April 9, 2001, she, the victim, David Vander Meyer, and Resendo Espinoza
5    went to the victim's apartment.  All but the victim left by 10 or 10:30 that night.  (Ex. K at
6    72-82, 116-17).  Resendo Espinoza, called as a defense witness, testified that on the evening
7    of April 9, 2001, he, Stephanie, the victim and "possibly Ryan" went to the victim's
8    apartment, then clarified that he could not recall if Ryan was there that night. (Ex. KK at 114-
9    17).  When confronted with his statement to defense counsel, Espinoza admitted that he had
10   said that he, Stephanie, the victim and Ryan had gone to the victim's apartment.  (*Id.*, at 121-
11   23).  He testified that he and Stephanie stayed in the living room and the victim and Ryan
12   went into the victim's bedroom.  (*Id.* at123).  Ryan Aubuchon, called as a defense witness,
13   testified that on or about the time of the victim's death, he had known her about two to three
14   weeks, had started a relationship with her, and that a couple of days before the murder, he,
15   Espinoza, and Stephanie Lozano went to the victim's apartment.  (Ex. LL at 10-11, 18, 20-
16   22).  Mr. Aubuchon denied going to the victim's apartment on April 9, 2001 but
17   acknowledged that he had been intimate with her three or four days before her death and had
18   used two condoms which he threw in the trash.  (*Id.* at 25-26).  When confronted with his
19   statement to the police, Mr. Aubuchon acknowledged he had been intimate with the victim
20   on Sunday (April 8, 2001) and their sexual encounter had occurred on the victim's bed.  (*Id.*
21   at 30-33).

22         During the defense case, defense counsel argued that the semen samples on the bed
23   and panties should be admitted because the State had tried to show through Stephanie Lozano
24   that the victim did not have a sexual relationship with Petitioner and because Detective
25   Jimenez had testified that the position of the panties found in the bedroom was indicative of
26   sexual assault.  (Ex. MM at 3-19).  After noting that defense expert Marc Taylor had
27   analyzed the stains on the sheets and panties, defense counsel made an offer of proof through
28

1    Taylor who testified that the stains on the sheets had been deposited since the last time the

2    sheets had been laundered.  (*Id*. at 19-20).  The trial court denied Petitioner's motion for

3    reconsideration.  (*Id*. at 21).

4              Petitioner's forensic expert, Marc Taylor, testified at trial that two condoms were

5    retrieved from the trash on the apartment porch and that cellular material from the condoms

6    yielded a DNA profile consistent with Aubuchon and possibly the victim but no sperm or

7    semen.  (Ex. OO at 25-29).  At the conclusion of Mr. Taylor's testimony, defense counsel's

8    renewed motion to present the results of analysis of the victim's sheets and panties was

9    denied.  (Ex. OO at 105).

10             A defendant's right to present evidence is not unlimited, but instead may give way to

11   the forum state's evidentiary and procedural rules.  *Clark v. Arizona*, 548 U.S. 735, 770

12   (2006).  In Arizona, evidence of third-party culpability is relevant if it tends "to create a

13   reasonable doubt as to the defendant's guilt," but such evidence should not be admitted if it

14   amounts to "mere suspicion or speculation."  *State v. Gibson*, 44 P.3d 1001, 1004 (Ariz.

15   2002); *State v. Dann*, 74 P.3d 231, 243 (Ariz. 2003).  Here, Petitioner presented evidence in

16   his defense that the victim had a sexual encounter with Aubuchon a few days prior to the

17   murder and that she was with a male companion at her apartment on the evening of her death.

18   There was conflicting evidence for the jury's determination regarding the identity of the male

19   companion.  Evidence regarding the semen stains on the bedding and underwear was

20   speculative as there was no evidence regarding the date that the semen had been deposited

21   or as to the identity of the donor.  Petitioner has not demonstrated how his due process rights

22   were violated by the trial court's exclusion of this latter evidence.  Neither has Petitioner

23   established how he was prejudiced by counsel's decision to not raise the exclusion of third-

24   party culpability evidence on appeal.  Appellate counsel meets the objective standard of

25   competence and does not cause prejudice when counsel does not raise a "weak issue." *Miller*

26   *v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).  Ground Nine is denied.

27

28

1

**(c)     Grounds One, Seven and Eight: Merits Analysis**

2

Petitioner's Grounds One, Seven and Eight concern issues raised on direct appeal that

3

were rejected by the Arizona Court of Appeals.

4

**Ground One - Petitioner's *Batson* challenge**

5

Petitioner, who notes that he is a Black man who was on trial for the alleged murder

6

of a white woman, contends in Ground One that two Black female jurors were removed

7

based on the impermissible reason of race.  (Am. Pet. at 6).  Petitioner's allegations are

8

essentially the same argument made by counsel in his direct appeal. (Ex. B at 25-48).

9

Respondents contend that the record shows that the Arizona Court of Appeals carefully

10

evaluated Petitioner's *Batson* claim before rejecting it.  (Answer at 10-11).

11

*Batson v. Kentucky*, 476 U.S. 79 (1986), established a three-step process for

12

evaluating a defendant's objection to a peremptory challenge.  A defendant must make a

13

prima facie showing that a challenge was based on race. If a defendant makes this showing,

14

the prosecution must then offer a race-neutral basis for the challenge. The prosecutor's

15

explanation need not be persuasive or even plausible. Finally, the court must determine

16

whether the defendant has shown "purposeful discrimination." *Batson*, 476 U.S. at 97-98;

17

*Rice v. Collins*, 546 U.S. 333, 338 (2006).  The ultimate burden of persuasion remains with

18

the opponent of the strike.  *Rice*, 546 U.S. at 338.  "[A] federal habeas court can only grant

19

[the] petition if it was unreasonable to credit the prosecutor's race-neutral explanations for

20

the *Batson* challenge."  *Id.* at 338-39.  State-court factual findings are presumed correct. 28

21

U.S.C. § 2254(e)(1).  On federal review of a habeas petition, "AEDPA 'imposes a highly

22

deferential standard for evaluating state-court rulings' and 'demands that state-court

23

decisions be given the benefit of the doubt.'" *Felkner v. Jackson*, 562 U.S. 594, 598 (2011)

24

(quoting *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010)).

25

The last reasoned decision on the issue is by the Arizona Court of Appeals.  *Gay*, 150

26

P.3d at 793-96.  The record shows that the prosecutor struck one juror (Barnard) for the

27

stated reason that the juror was visibly displeased with how the police had handled her

28

1  nephew's murder, appeared "stern looking" and "angry" with a "glare," and who refused to
2  make eye contact with the prosecutor. *Gay*, 150 P.3d at 793. As for the other juror (Parker),
3  the prosecutor stated as reasons for removal that the juror disliked the death penalty, had
4  "problems with graphic details and gruesome photos," was "sympathetic according to [the
5  state's] drug user question; and "would be distracted by upcoming medical tests." *Id*. The
6  court of appeals determined that the trial court did not err by finding the state's explanations
7  facially race-neutral. *Id*. at 793-94. *See Williams v. Rhoades*, 354 F.3d 1101, 1109 (9th Cir.
8  2004) (citing *Burks v. Borg*, 27 F.3d 1424, 1429 & n.3 (9th Cir. 1994) ("prosecutor's
9  evaluation of a juror's demeanor, tone, and facial expressions may lead to a 'hunch' or
10  'suspicion' that the juror might be biased, and that a peremptory challenge based on this
11  reason would be legitimate")); *Felkner*, 562 U.S. at 598 (trial court's determination of racial
12  motivation or lack thereof is entitled to great weight in evaluating a *Batson* claim).

13        Petitioner contends that there were several non-black jurors who were crime victims
14  or had family members who were crime victims but the prosecutor did not question them.
15  (Am. Pet. at 6). As discussed by the State Court of Appeals, the record shows that one of
16  the jurors (Barnard) was the only juror who expressed a negative attitude about law
17  enforcement. *Gay*, 150 P.3d at 794-95. The appellate court considered this issue in its
18  decision and noted that two jurors stated that the perpetrators of the crimes they discussed
19  had been arrested and convicted and the other juror, whose assailant had not been prosecuted,
20  said nothing suggesting that she had a negative attitude toward law enforcement. *Id*., at 795
21  ("Thus, the prosecutor may not have felt she needed to explore the attitudes of these three
22  toward law enforcement."). *See Mitleider v. Hall*, 391 F.3d 1039, 1048 (9th Cir. 2004)
23  (previous negative experience with law enforcement constitutes acceptable race-neutral
24  explanation for striking a potential juror).

25        Petitioner contends that juror Parker was struck because of reservations about the
26  death penalty while "[t]wo other non-black jurors (Bernard and Kinsella) were as equivocal

27

28

- 33 -

1  about the death penalty, agreed to follow the law, and were not struck." (Am. Pet. at 6).  This

2  issue was considered and rejected by the Arizona Court of Appeals:

3      Although there is some similarity among the answers of Parker, Bernard, and
       Kinsella, we note that it was only Parker who was personally affected by the
4      death sentence.  Additionally, the trial court was in a better position than we
       are to evaluate both the sincerity of the jurors' responses and the prosecutor's
5      explanations. . . .  We defer to those determinations.

6  *Gay*, 150 P.3d at 795.  Petitioner has not argued any reasons supported by facts in the record

7  regarding why this decision is incorrect.

8      Petitioner complains that "[t]he percentage of Blacks struck was twice as high (33%)

9  than the percentage of Blacks on the venire (17%)." (Am. Pet. at 6).  The Arizona Court of

10 Appeals considered this issue and determined that "the fact that four African-Americans

11 served as either jurors or alternates is "'indicative of a nondiscriminatory motive'" and that

12 "the statistical disparity alone does not suggest the trial court erred." *Gay*, 150 P.3d at 794.

13 The presence of other minority jurors is indicative of a nondiscriminatory motive. *Gonzalez*

14 *v. Brown,* 585 F.3d 1202, 1210 (9th Cir. 2009) (internal quotation marks and citation

15 omitted).

16     The Arizona Court of Appeals decision was not contrary to, or an unreasonable

17 application of, the holdings of then-existing Supreme Court precedent. Ground One is denied

18 and dismissed.

19     **Ground Seven: Exclusion of Defense Expert Testimony Regarding Post-Arrest**

20     **Statements**

21     Petitioner asserts that the trial court violated his due process rights when it ruled

22 inadmissible testimony from an expert that Petitioner's post-arrest statements were unreliable

23 because Petitioner was in severe cocaine withdrawal at the time he made the statements.

24 (Am. Pet. at 14).  He contends that his expert's testimony was also proposed for a

25 suppression hearing as tending to show that his statements were not voluntary. (*Id.*).

26 Respondent asserts that Petitioner sought to introduce this evidence only at his pretrial

27 voluntariness hearing, not during trial. (Answer at 11).  Respondent argues that the evidence

28

1  was irrelevant to the voluntariness determination because it did not relate to the presence or
2  absence of official police coercion which is the linchpin for a finding of involuntariness. (*Id.*
3  at 11-12).

4       Petitioner's ground in his amended habeas petition is essentially the same as the issue
5  he raised on direct appeal. Petitioner sought to introduce at the pretrial suppression hearing
6  the testimony of Dr. Jacquelyn St. Germaine, a psychologist, regarding the effects of crack
7  cocaine or withdrawal of crack cocaine on his state of mind during the police interview.
8  *Gay*, 150 P.3d at 797. The trial court granted the State's objection to the testimony, finding
9  that there was "no evidence of police coercion during the taping of the defendant's
10 statements" and that the psychologist's testimony would not assist the court in determining
11 voluntariness. *Gay*, 150 P.3d at 797. Petitioner filed a motion for reconsideration in the trial
12 court, arguing that the expert's testimony could be relevant to a determination that his
13 statement was unreliable. (Ex. T at 72-87). The trial court denied Petitioner's motion for
14 reconsideration. *Gay*, 150 P.3d at 798. Petitioner raised these issues on direct appeal. The
15 appellate court's opinion is the last reasoned ruling for consideration on habeas review.

16      With respect to relevance to voluntariness, the Court of Appeals determined that the
17 record supported the trial court's finding that there was no evidence of police coercion in this
18 case. *Gay*, 150 P.3d at 798. Relying on *Colorado v. Connelly*, 479 U.S. 157, 164 (1986),
19 the appellate court held that "[w]ithout evidence of police coercion, St. Germaine's testimony
20 could not have aided the court in determining voluntariness." *Gay*,. 150 P.3d at 798. With
21 respect to reliability, the appellate court observed that Petitioner's reliance on *Crane v.*
22 *Kentucky*, 476 U.S. 683 (1986), was misplaced, as "the issue in *Crane* was the admissibility
23 at trial of testimony regarding the reliability of a confession." *Gay*, 150 P.3d at 798. The
24 appellate court reasoned that "'the purpose that a voluntariness hearing is designed to serve
25 has nothing whatever to do with improving the reliability of jury verdicts.'" *Gay*, 150 P.3d
26 at 798 (quoting *Lego v. Twomey*, 404 U.S. 477, 486 (1972)). It additionally noted that the
27 State had not objected to the use of St. Germaine's testimony at trial but that "[Petitioner] did

28

1   not attempt to introduce her testimony at trial and does not allege any trial error regarding

2   the reliability of his statements to police." *Gay*, 150 P.3d at 798. Finally, the State appellate

3   court considered Petitioner's argument that St. Germaine would not have testified about his

4   mental state during questioning, but would have testified about "'the general effects of crack

5   cocaine and withdrawal from crack and that [Gay's] statements were consistent with those

6   of a person who is addicted to crack and 'crashing.''" *Gay*, 150 P.3d at 798. In rejecting this

7   argument, the appellate court opined that to the extent St. Germaine would have testified

8   about the general effects of crack cocaine or withdrawal from crack cocaine on the human

9   body, the testimony was irrelevant to the voluntariness determination. 150 P.3d at 798. In

10  addition, St. Germaine's "report was insufficient to establish that [Petitioner's] statements

11  were 'so unreliable that they [should have] be[en] excluded under the evidentiary laws of the

12  forum.'" 150 P.3d at 798. The appellate court ultimately concluded that the trial court had

13  not erred in its decision to preclude St. Germaine's testimony. *Id.*

14          Petitioner has not asserted in the amended habeas petition the violation of a

15  constitutional right based on any factual or legal error by the Arizona Court of Appeals. The

16  substance of Petitioner's post-arrest statements was not relevant to the voluntariness

17  determination which concerned the presence or absence of official law enforcement coercion.

18  *See Connelly*, 479 U.S. at 167 (police coercion is a necessary predicate to involuntariness;

19  defendant's state of mind cannot prove involuntariness by itself without police coercion).

20  Petitioner argues that the evidence should have been admitted based on *Crane*, 476 U.S. 683.

21  *Crane* dealt with the admission of evidence at trial bearing on the reliability of a confession.

22  476 U.S. at 684. The issue in *Crane* concerned the defendant's ability to present a full

23  defense to the crimes charged. Petitioner never sought to admit the expert testimony at trial.

24  The Arizona Court of Appeals reasonably concluded that *Crane* did not apply and thus did

25  not misapply Supreme Court precedent. Ground Seven is denied.

26

27

28

1  **Ground Eight: Denial of Motion to Suppress**

2      Petitioner contends that his waiver of his *Miranda* rights was not knowing, intelligent,

3  or voluntary because the detective's explanation was unclear, confusing and misleading in

4  violation of Supreme Court precedent, citing *Doody v. Ryan*, 649 F.3d 986, 1003-07 (9th Cir.

5  2011). (Am. Pet. at 15). Petitioner contends that after the detective advised him of his rights,

6  Petitioner asked "when is it possible to have an attorney appointed to me?" (*Id*.). The

7  detective responded that Petitioner would be arraigned the next day and an attorney would

8  be appointed after that, which Petitioner contends, contradicted the detective's prior

9  statement that he could have an attorney present prior to and during questioning. (*Id*.).

10  Respondents contend in their Answer that Petitioner made only vague inquiries about when

11  an attorney would be appointed, did not unambiguously request counsel, and that his

12  questions did not communicate that he was actually requesting counsel but were mere

13  inquiries about the availability of counsel. (Answer at 12-13).

14      Petitioner filed a motion to suppress statements which the trial court denied after an

15  evidentiary hearing. (Ex. B at 56-57; Ex. C at 64-66). Petitioner raised the issue on direct

16  appeal and the Arizona Court of Appeals found no *Miranda* violation based on its extensive

17  review of the record and case law. *Gay*, 150 P.3d at 796-97. The appellate court's ruling is

18  the last reasoned decision on the issue.

19      The state appellate court set out as follows the relevant discussion between Petitioner

20  and police officers when regarding Petitioner's statement:

21          After arresting Gay, Detectives Olivas and Thompson took a statement from him. After Olivas informed Gay of his *Miranda* rights,[4] Gay asked:
22  'Well, when is it possible to have an, an attorney appointed to me?" The following exchange then occurred:

23   

24  [Olivas]: If, if you want an attorney, at this point, I'm not gonna ask you any questions at all. What's gonna happen is you're gonna go to the jail, tomorrow you're gonna have arraignment, and then an attorney will be appointed for
25  you. If you can't afford, if you cannot afford one.
[Gay]: But would I get an attorney anyway? I mean ...?
26  [Olivas]: Yes.

27  

28      [4] *See* Ex. C at 64.

1      [Gay]: Oh, okay.
       [Olivas]: Do you understand that?
2      [Gay]: Yeah, I, I guess.
       [Olivas]: Well, there can't be no [sic] guessing.  I need to, either you don't
3      understand them, or you do.  If you wanna talk to us, everything you say can
       be used against you in a court of law.  If you don't wannna talk to us, you
4      don't have to talk to us, basically is [sic] what's gonna go, happen is, I'm
       gonna, I will ask you information on a booking form, nothing about the case
5      and then you're going to jail.  At the jail, within the next few days or, or a
       week or so, you, you'll, they'll appoint you a lawyer if you cannot afford one.
6      [Thompson]: Actually, they'll appoint him the, the attorney at his initial
       appearance, which will be tomorrow at two.
7      [Olivas]: They'll tell you who your attorney is.
       [Thompson]: Right.
8      [Olivas]: You may not have a chance to talk to him, but you'll have an
       attorney.
9      [Gay]: Okay.  That's even, when, if we do talk?
       [Olivas]: Right
10     [Gay]: Okay.
       [Olivas]: Okay?
11     [Gay]: Yeah.
       [Olivas]: You understand that?
12     [Gay]: Mmm hmm [positive response].
       [Olivas]: Are you willing to talk with me?
13     [Gay]: Yeah.

14     *Gay,* 150 P.3d at 796.

15          The Arizona Court of Appeals noted that, "For an invocation of the *Miranda* right to

16     counsel to be effective, the accused 'must articulate his desire to have counsel present

17     sufficiently clearly that a reasonable police officer in the circumstances would understand

18     the statement to be a request for an attorney.'" 150 P.3d at 796 (citing and quoting *State v.*

19     *Eastlack*, 883 P.2d 999, 1006 (1994) (quoting *Davis v. United States*, 512 U.S. 452, 459

20     (1994)). Based on this authority, the appellate court determined that "[a] 'reasonable police

21     officer in the circumstances' would not have understood Gay's question as a request for an

22     attorney, especially because Olivas prefaced his reading of Gay's *Miranda* rights by saying:

23     'If you have any questions at all, I want you to ask them and if you don't understand [the

24     *Miranda* rights], I want you to tell me.  Okay?'" 150 P.3d at 797.

25          Based on prevailing Supreme Court precedent at the time of the state appellate court's

26     decision, for Petitioner to validly request counsel, he was required to articulate his desire

27     sufficiently clear so that "a reasonable police officer in the circumstances would understand

28

[his] statement to be a request for an attorney." *Davis*, 512 U.S. at 459.  If the suspect indicates a request for counsel, "the interrogation must cease until an attorney is present." *Edwards v. Arizona*, 451 U.S. 477 (1981).   Petitioner's question, "but would I get an attorney anyway," did not sufficiently articulate a request for an attorney.  *See Clark v. Murphy*, 331 F.3d 1062, (9th Cir. 2003) (holding that the state court's ruling that the statement "I think I would like to talk to a lawyer" was ambiguous was not an unreasonable application of clearly established federal law so as to warrant federal habeas relief), *overruled on other grounds by Lockyer v. Andrade,* 538 U.S. 63 (2003).  Petitioner has not shown in his amended habeas petition how the state appellate court's ruling was factually incorrect or in contravention of Supreme Court precedent.

        In response to Petitioner's other argument that, even if his question was ambiguous, the officers failed to clarify sufficiently whether he was in fact requesting counsel and thus he failed to understand the scope of his *Miranda* rights, the Arizona Court of Appeals reasoned as follows:

> In Arizona, when a request for counsel is ambiguous, police must limit any further questioning to clarify defendant's request. *See State v. Finehout*, 136 Ariz. 226, 229, 665 P.2d 570, 573 (Ariz. 1983); *see also* [*State v.*] *Inman*, 151 Ariz. [413] at 416, 728 P.2d [283] at 286 [(Ariz. App. 1986)]. Here, following Gay's ambiguous assertion, Olivas limited his questioning to explaining what would happen to Gay if he requested an attorney and when he would be able to access that attorney.  Although Olivas and Thompson had some difficulty explaining exactly when Gay's attorney would be appointed, they did make clear that if he asked for an attorney, they would cease questioning and an attorney would be appointed for him.  Because Olivas and Thompson limited this further questioning to clarifying Gay's statement, there was no *Miranda* violation.

150 P.3d at 797.

        Petitioner contends in his amended habeas petition that he was confused because Detective Olivas first told him that he could have an attorney present prior to questioning and then told him that an attorney would not be appointed until the next day or even later. (Am. Pet. at 15).  But Petitioner's assertion overlooks that Detective Olivas told him at the outset that if he wanted an attorney "at this point," Olivas would cease questioning him.  The detectives also attempted to explain to him when an attorney would be appointed. However,

- 39 -

1   the Supreme Court has not adopted a rule that requires police officers to respond to

2   ambiguous statements by asking clarifying questions to ascertain whether the suspect wants

3   an attorney. *Berghius v. Thompkins*, 560 U.S. 370 (2010) (under *Davis*, if an accused makes

4   a statement concerning his right to counsel "that is ambiguous or equivocal" or makes no

5   statement, the police are not required to end the interrogation, or to ask questions to clarify

6   whether the accused wants to invoke his or her *Miranda* rights).  Ground Eight is denied.

### C.      Grounds Six and Ten: Procedural Default and Dismissal

#### 1.      Legal Standards

9         A state prisoner must exhaust his remedies in state court before petitioning for a writ

10   of habeas corpus in federal court.  28 U.S.C. § 2254(b)(1) & (c); *Duncan v. Henry*, 513 U.S.

11   364, 365-66 (1995); *McQueary v. Blodgett*, 924 F.2d 829, 833 (9th Cir. 1991).  To properly

12   exhaust state remedies, a petitioner must fairly present his claims to the state's highest court

13   in a procedurally appropriate manner.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).  In

14   Arizona, a petitioner just fairly present his claims to the Arizona Court of Appeals or through

15   appropriate post-conviction relief.  *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999).

16         A claim has been fairly presented if the petitioner has described both the operative

17   facts and the federal legal theory on which the claim is based.  *Sivak v. Hardison*, 658 F.3d

18   898, 908 (9th Cir. 2011).  "If a petitioner fails to alert the state court to the fact that he is

19   raising a federal constitutional claim, his federal claim is unexhausted regardless of its

20   similarity to the issues raised in state court." *Johnson v. Zenon,* 88 F.3d 828, 830 (9th Cir.

21   1996). "[G]eneral appeals to broad constitutional principles, such as due process, equal

22   protection, and the right to a fair trial, are insufficient to establish exhaustion."  *Hiivala v.*

23   *Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) (citing *Gray v. Netherland*, 518 U.S. 152, 162-63

24   (1996)).

25         The State retains the burden to prove the adequacy of the bar.  Once the State raises

26   procedural default as an affirmative defense, "the burden to place that defense in issue shifts

27   to the petitioner." *Bennett v. Mueller*, 322 F.3d 573, 585-86 (9th Cir. 2003).  "The petitioner

28

1   may satisfy this burden by asserting specific factual allegations that demonstrate the
2   inadequacy of the state procedure, including citation to authority demonstrating inconsistent
3   application of the rule." *Id.*

4       Where a prisoner fails to "fairly present" a claim to the state courts in a procedurally
5   appropriate manner, state court remedies may, nonetheless, be "exhausted." This type of
6   exhaustion is often referred to as "procedural default" or "procedural bar." *Ylst v.*
7   *Nunnemaker*, 501 U.S. 797, 802–05 (1991); *Coleman v. Thompson*, 501 U.S. 722, 731–32
8   (1991). A habeas petitioner's claims may be precluded from federal review in two ways.
9   First, a claim may be procedurally defaulted in federal court if it was actually raised in state
10  court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S.
11  at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present
12  it in state court and "the court to which the petitioner would be required to present his claims
13  in order to meet the exhaustion requirement would now find the claims procedurally barred."
14  *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (explaining district
15  court must consider whether the claim could be pursued by any presently available state
16  remedy).  If there are claims that were not raised previously in state court, the court must
17  determine whether the petitioner has state remedies currently available to him pursuant to
18  Rule 32. *See Ortiz*, 149 F.3d at 931. If no remedies are currently available, the petitioner's
19  claims are "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735
20  n.1.

21      The federal court will not consider procedurally defaulted claims unless the petitioner
22  can demonstrate that a miscarriage of justice would result, or establish cause for his
23  noncompliance and actual prejudice.  *See Schlup v. Delo*, 513 U.S. 298, 321 (1995).  To
24  establish a "fundamental miscarriage of justice," a state prisoner must establish it is more
25  likely than not that no reasonable juror could find him guilty of the offense. *Id.,* 513 U.S. at
26  327. A state prisoner demonstrates  "cause" by showing that some objective factor external
27  to the prisoner or his counsel impeded efforts to comply with the state's procedural rules.

28

1    *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). To establish prejudice, the prisoner must

2    show that the alleged constitutional violation "worked to his actual and substantial

3    disadvantage, infecting his entire trial with error of constitutional dimensions." *United States*

4    *v. Frady*, 456 U.S. 152, 170 (1982).

5                    **2.    Discussion**

6              Petitioner did not raise in the state trial court or before the Arizona Court of Appeals

7    either Ground Six alleging that the trial court failed to give a lesser included instruction on

8    theft[5] or Ground Ten asserting ineffective assistance of trial counsel based on failure to

9    conduct DNA testing.   In Arizona, Rule 32.2(a)(1) of the Arizona Rules of Criminal

10   Procedure provides that post-conviction relief is not available on any ground "raisable on

11   direct appeal under [Ariz.R.Crim.P.] 31 or on post-trial motion under Rule 24."

12   Ariz.R.Crim.P. 32.2(a)(1).  It therefore does not appear that Petitioner can now return to state

13   court to exhaust these grounds. When issues are procedurally defaulted, federal review of the

14   claim is not barred if the petitioner demonstrates "cause and prejudice" or a "fundamental

15   miscarriage of justice."

16             As to Grounds Six, Petitioner contends that to the extent that this claim was not

17   "'fairly presented'" in the direct appeal, his appellate lawyer provided ineffective assistance.

18   (Doc. 15, Reply at 7). Petitioner also contends that the ineffective assistance of appellate

19   counsel should have been raised in the state court PCR but was not, and federal habeas

20   review is not precluded based on *Martinez v. Ryan*, 132 S.Ct. 1309 (2012).  (*Id.*).  Petitioner

21   contends in his Reply that Ground Ten is not precluded also based on *Martinez v. Ryan*.

22   (Reply at 8-9).  Petitioner contends that his first opportunity to present the issue that trial

23   counsel was ineffective in failing to have the victim's finger nails tested for DNA was in his

24   initial post-conviction petition but his PCR attorney did not raise the claim. (*Id.* at 9).

25             In *Martinez v. Ryan*, the Supreme Court held that, in certain circumstances,

26   "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish

27

28             [5]*See* Ex. NN at 49, 51, 65-66 (refusal and theft as lesser included instruction).

1   cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S.

2   Ct. at 1315.  The Ninth Circuit Court of Appeals has expanded *Martinez* to apply to an

3   underlying claim of ineffective assistance of appellate counsel.  *Ha Van Nguyan v. Curry*,

4   736 F.3d 1287, 1293-96 (9th Cir. 2013).  To satisfy *Martinez*, a habeas petitioner must

5   demonstrate that his underlying ineffective assistance of trial counsel claim is substantial,

6   that he had ineffective counsel during the state collateral proceeding, the state collateral

7   proceeding was the initial review proceeding for the claim, and state law required him to

8   bring the claim in the initial collateral review proceeding. *Trevino v. Thaler*, 133 S.Ct. 1911,

9   1918 (2013).  To show that the underlying ineffective assistance of trial counsel claim is

10  "substantial," the petitioner "must demonstrate that the claim has some merit." *Martinez*, 132

11  S.Ct. at 1318.

12      **Ground Six**.  Petitioner states in his Reply as to Ground Six that defense counsel

13  asked the trial court for an instruction on theft.   (Reply at 6-7). However, his further

14  contention in his Reply that PCR counsel should have raised the claim based on ineffective

15  assistance of appellate counsel does not establish cause. Ground Six is not a claim of

16  ineffective assistance of trial or appellate counsel but an independent substantive claim.

17  *Martinez*, 132 S.Ct. at 1319 ("an attorney's negligence in a postconviction proceeding does

18  not establish cause, and this remains true except as to initial-review collateral proceedings

19  for claims of ineffective assistance of counsel at trial"); *Maples v. Thomas*, 132 S.Ct. 912,

20  922 (2012) ("[n]egligence on the part of a prisoner's postconviction attorney does not qualify

21  as 'cause'").

22      Arguably, to the extent, if any, that *Martinez* does apply, Petitioner has not shown that

23  his claim of ineffective assistance has "some merit."  In *Beck v. Alabama*,  447 U.S. 625,

24  633-38 (1980), the Supreme Court held that a death sentence cannot be constitutionally

25  imposed after a jury finds a defendant guilty of capital murder when the jury was not

26  instructed to consider lesser-included noncapital offenses that the evidence would have

27  supported.  The state trial court here instructed the jury that it could find Petitioner guilty of

28

the lesser-included offense of second-degree murder.  (Ex. PP at 32-33).  Importantly, the jury did not sentence Petitioner to death. *Gay*, 150 P.3d at 790.  In addition, under Arizona law,  theft is not a lesser-included offense of burglary.  *State v. Arnold*, 565 P.2d 1282, 1283 (Ariz. 1977).  Appellate counsel therefore was not professionally ineffective in not raising the issue on direct appeal.  *Morrison v. Estelle*, 981 F.2d 425, 429 (9th Cir. 1992) (appellate counsel not ineffective where argument would not be successful).

**Ground Ten**.  Petitioner asserts in his amended habeas petition that trial counsel "was ineffective for failing to conduct DNA testing on key evidence, including the victim's fingernail scrapings and nightgown." (Am. Pet. at 17).  Petitioner contends that Michael Sweedo, who testified at the evidentiary hearing, stated that fingernail evidence is routinely investigated by the medical examiner, noting that a female may have an attacker's skin under her nails when she defends herself and sustains defensive wounds.  (Am. Pet. at 17). Petitioner further contends that reasonable doubt would have resulted had the examination results come back negative for his DNA or positive for Popenko's DNA. (*Id*.). As previously discussed with respect to Ground Two, Petitioner did not submit Sweedo's expert report as an exhibit "to [his] PCR brief" but Respondents have provided the report as an attachment to their supplemental memorandum. (Reply at 8-9; Doc. 24 at 6 & Ex. AAA, internal ex.15). Sweedo noted in his report that fingernail scrapings from the victim were not tested and it "remain[ed] unknown whether the collections contain DNA from another individual or not." (Ex. AAA, internal ex. 15, last page).

Petitioner has not demonstrated that his ineffective assistance claim has "some merit." The record shows that Sweedo, a criminal investigator for the Pima County Public Defender's Office,  testified at the post-conviction hearing regarding Petitioner's ineffective assistance of counsel claim based on the alleged failure to investigate blood spatter evidence. (Ex. Q, pp. 7-58).  Mr. Sweedo did not testify about fingernail evidence at the evidentiary hearing.  During trial, Dr. Bruce Parks, Chief Medical Examiner for Pima County, testified that the victim's hands were photographed and covered with scene bags to preserve potential

1   evidence .  (Ex. P at 96, 119).  Dr. Parks testified that he performed nail scrapings and

2   clipped the victim's nails after checking her hands for trace evidence.  (*Id*. at 121).  State's

3   witness Gary Harmor, senior forensic serologist at the Serological Research Institute in

4   Richmond, California, testified at trial on cross-examination by defense counsel that

5   screening fingernail scrapings would include examining them for the presence of biological

6   material but he was not given fingernail scrapings in this case. (Ex. O at 58-59).  State

7   witness Nora Rankin, employed as a senior criminalist/forensic scientist for the Tucson

8   Police Department, testified that DNA testing or examination may not be done on fingernail

9   scrapings if the victim's hands are covered in blood.  (Ex. JJ at 61-62, 68-72).  Detective

10  Jimenez and expert Dr. Reeves, State's witnesses,  testified that the victim had blood on her

11  hands.  (Ex. M at 42 ("significant amount of blood on the victim's hands"); Ex. JJ at 23-24).

12  Defense witness and expert Marc Taylor testified at trial that the victim's fingernail scrapings

13  could have been tested but it was not requested based on "a number of evaluations that went

14  into that."  (Ex. OO at 90-92).  Taylor noted that blood on the victim's hands "would have"

15  contaminated the results.  (*Id*. at 91).

16      State's witness Mary Ann Walkinshaw, at the time an employee of the forensic

17  serology DNA section, Tucson Police Crime Lab, testified that DNA collected from the

18  victim's vagina came from Petitioner as the single male source to the exclusion of three other

19  males. (Ex. ZZ at 53-58).  All of the tested blood samples from the victim's apartment came

20  from either Petitioner or the victim.  (Ex. L at 11, 14-17, 24, 40-45; Ex. N at 35-54; Ex. ZZ

21  at 45, 52).

22      Finally, contrary to Petitioner's contention, DNA testing was performed on the

23  victim's nightgown and the results came back positive for the presence of Petitioner's blood

24  and semen.  (Ex. GG at 49-53; Ex. HH at 31, 37-39).  Petitioner's own expert Marc Taylor

25  testified at trial about tests performed on the nightgown and the presence of a post-coital

26  stain.  (Ex. OO at 15-25).

27

28

1     The record supports the finding that defense counsel made a strategic decision not to

2 test the victim's fingernail clippings and scrapings.  Petitioner has not shown how he was

3 prejudiced by this omission.  Petitioner has not shown a prejudicial omission by defense

4 counsel regarding the victim's nightgown because DNA testing was performed on this item

5 of clothing.

6     With respect to Grounds Six and Ten, Petitioner has not established cause for the

7 procedural default of these grounds.  It is not necessary for the Court to further consider

8 whether Petitioner has demonstrated prejudice from the procedural default.  *See Thomas v.*

9 *Lewis*, 945 F.2d 1119, 1123 n.10 (9th Cir. 1991).  Petitioner has not asserted with respect to

10 Grounds Six and Ten that he is actually innocent. Grounds Six and Ten are dismissed as

11 procedurally defaulted.

12 **III.   Conclusion and Denial of Certificate of Appealability**

13     For the foregoing reasons, Petitioner's Grounds One through Five, Seven through

14 Nine and Eleven, raised in his Amended Petition are without merit and Grounds Six and Ten

15 are procedurally defaulted.  The Amended Petition is, therefore, denied and dismissed with

16 prejudice.

17     Before Petitioner can appeal this Court's judgment, a certificate of appealability

18 ("COA") must issue. See Fed. R. App. P. 22(b)(1) (the applicant cannot take an appeal unless

19 a circuit justice or a circuit or district judge issues a certificate of appealability under 28

20 U.S.C. § 2253(c)).  The standard for issuing a certificate of appealability is whether the

21 applicant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C.

22 § 2253(c)(2). Where  the "district court has rejected the constitutional claims on the merits,

23 the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate

24 that reasonable jurists would find the district court's assessment of the constitutional claims

25 debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  When the district court

26 denies a habeas petition on procedural grounds without reaching the petitioner's "underlying

27 constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of

28

1  reason would find it debatable whether the petition states a valid claim of the denial of a

2  constitutional right and that jurists of reason would find it debatable whether the district court

3  was correct in its procedural ruling." *Id.*

4          Upon review of the record in light of the standards for granting a certificate of

5  appealability, the Court concludes that a certificate shall not issue given that: (1) as for

6  Grounds Six and Ten, addressed on procedural grounds, jurists of reason would not find it

7  debatable whether Court was correct in its procedural ruling; and (2) as for Grounds One

8  through Five, Seven through Nine, and Eleven jurists of reason would not find the Court's

9  assessment debatable or wrong. The Amended Petition does not require further proceedings.

10         Accordingly,

11         IT IS ORDERED that Petitioner's Amended Petition Under 28 U.S.C. § 2254 For A

12  Writ of Habeas Corpus By A Person In State Custody (Non-Death Penalty) (Doc. 5) is:

13         (1)      DENIED on the merits with regard to Grounds One through Five, Seven

14                  through Nine, and Eleven; and

15         (2)      DISMISSED WITH PREJUDICE as procedurally defaulted with regard to

16                  Grounds Six and Ten.

17         IT IS FURTHER ORDERED that a Certificate of Appealability is DENIED and shall

18  not issue.

19         The Clerk of Court is directed to enter judgment accordingly and close the file in this

20  matter.

21         DATED this 30th day of September, 2016.

22

23

24  **CHARLES R. PYLE**
    **UNITED STATES MAGISTRATE JUDGE**

25

26

27

28

- 47 -